IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEBORAH A. SIEGEL,

Plaintiff, No. CIV S-08-0801 GGH

vs.

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant. / ORDER

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons that follow, Plaintiff's Motion for Summary Judgment or Remand is granted in part, the Commissioner's Cross Motion for Summary Judgment is denied, and this matter is remanded to the ALJ for further findings as directed in this opinion. The Clerk is directed to enter judgment for plaintiff.

BACKGROUND

Plaintiff, born October 13, 1956, applied on December 4, 2003 for disability benefits. (Tr. at 79.) Plaintiff alleged she was unable to work due to headaches, depression, arthritis, back and neck injuries. (Tr. at 53.)

In a decision dated September 26, 2006, ALJ Mark C. Ramsey determined plaintiff was not disabled. The ALJ made the following findings:[1]

> 1. The claimant has not engaged in substantial gainful activity since July 31, 2001, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq*.).
>
> 2. The claimant has the following severe combination of impairments: chronic low back pain, degenerative osteoarthritis of the cervical and lumbar spine and hips, and adjustment disorder with mixed anxiety and depressive features (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

functional capacity to lift 20 pounds occasionally and 10 pounds frequently, walk/stand six hours, sit six hours, occasionally perform postural activities reach overhead occasionally (these are supported by her chronic low back pain, degenerative osteoarthritis of the cervical and lumbar spine and hips, coupled with her partially credible pain complaints as discussed below), and mentally perform simple routine tasks (this is supported by her adjustment disorder with mixed anxiety and depressive features).

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on October 13, 1956 and was 47 years old on the date the application was filed, which is defined as a younger individual age 45-49 (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10. The claimant has not been under a "disability," as defined in the Social Security Act, since October 16, 2003 (20 CFR 416.920(g)), the date the application was filed.

(Tr. at 26-33.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Fully and Fairly Develop the Record Regarding Plaintiff's Spinal Impairments; B. Whether the ALJ Erred in Determining That Plaintiff Was Not Fully Credible; C. Whether the ALJ's Residual Functional Capacity Assessment That Plaintiff's Non-exertional Impairments Did not Significantly Limit Her from Performing the Full Range of Light Work is Not Supported by Substantial Evidence; and D. Whether the Appeals Council Erred in Failing to Review Plaintiff's Case After Receiving New and Material Evidence.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), *quoting* Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

A. Development of the Record and Evidence Submitted to Appeals Council Regarding Plaintiff's Spinal Impairments

Plaintiff first contends that the ALJ failed to fully develop the record because he did not obtain records of the results of the recommended EMG/NVC testing of plaintiff's lower extremities to determine whether there was evidence of neurological impairment. Instead, he concluded only that she had orthopedic degenerative impairments. She claims that pain and muscle spasms in her legs and feet causing her to be unable to sit or stand for more than twenty minutes are attributable to a neurological cause.[2]

---

[2] Plaintiff also complains that the ALJ failed to address certain treatment records indicating that plaintiff was treated at the Emergency Room for pain, and that the ALJ only noted part of the MRI results of plaintiff's cervical spine in his decision. Pl.'s Mot. at 15-16. Although the ALJ is not required to discuss every piece of evidence, the record does need to demonstrate that he considered all of the evidence, and in this case it does. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (finding ALJ's summary conclusion that appellant's impairments did not meet or equal any Listed Impairment was a bare conclusion beyond meaningful judicial

The records to which plaintiff refers are a prescription by John Stack, Physician's Assistant, on April 13, 2005, for "EMG/NCV bilat LE 2 peripheral neuropathy." (Id. at 364.) The only record indicating that the EMG/NCV was conducted is a chart note on April 29, 2005, which states, "leg pain etiology unclear had EMG/NCV exam WNL (within normal limits)." (Id. at 362.) The ALJ was not required to obtain the 2005 EMG/NCV as Mr. Stack's description of the result of this study was normal and did not explain the cause of plaintiff's leg pain. It does not appear that the study itself would have shed further light on plaintiff's condition.

More importantly, there is a later record reflecting an electromyogram/nerve conduction study which was performed on June 19, 2007. The results were within normal limits for the nerve conduction studies, and in regard to the EMG, the finding was "decreased recruitment, increased amplitude and polyphasic motor units in the vastus medialis, tensor fascia lata and the lower lumbar paraspinal muscles bilaterally." (Tr. at 390-91.) The study showed evidence of "bilateral chronic L4 radiculopathy, without ongoing denervation." There was no evidence of peripheral neuropathy. (Id. at 391.)

With this more recent study in the record, it is not clear why plaintiff chooses to focus on a 2005 study that is not in the record. Although the 2007 study was not before the ALJ, it was considered by the Appeals Council and therefore is properly before this court.

The Appeals Council denied plaintiff's request for review on March 14, 2008, and wrote that it considered the newly admitted evidence, but found it did not provide a basis for changing the ALJ's decision. (Tr. at 6-7.) Plaintiff argues that the Appeals Council erred by failing to find this electrodiagnostic testing and other evidence to be material in regard to neurological abnormalities.

\\\\\

---

review). The ALJ referred to the cervical MRI from April 16, 2003, and set forth its impressions in full. (Tr. at 28, 298.) He was not required to recite the entirety of the MRI analysis.

The court finds that the ALJ carefully considered those records which were before him. Therefore, this court will focus only on those records not before the ALJ directly.

Here, the Appeals Council "declined to review" the ALJ's decision after considering the case on the merits, examining the entire record, including the additional material, and concluding that the ALJ's decision was proper. If the Appeals Council denies review, the decision of the ALJ is the final decision of the Secretary. If the Appeals Council accepts review and renders a decision, the final decision of the Secretary is that of the Appeals Council. 20 C.F.R. § 404.981; Reyes v. Bowen, 845 F.2d 242, 244 (10th Cir. 1988). The situation here is a hybrid of the usual situation where the Appeals Council has denied review, but has nevertheless ruled upon the newly submitted evidence. In these circumstances, the district court reviews the decision of the ALJ as supplemented by the Appeal Council's comments about the new evidence. This "new" evidence is part of the record before the court. See Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000) (additional materials are properly considered where the Appeals Council addressed them in the context of denying claimant's request for review).

This 2007 EMG report, which was not before the ALJ, indicates radiculopathy for the first time where prior records had definitively shown no radiculopathy. Therefore, fairness dictates that the ALJ be given the opportunity to review these records for a new determination.

The record before the ALJ was otherwise fully developed in regard to plaintiff's back and leg pain. The ALJ discussed plaintiff's April 16, 2003 MRI of the cervical spine which indicated no neural foraminal stenosis throughout. At C2-3, there was no disc protrusion or spinal stenosis. At C3-4 there was "mild posterior central disc protrusion, tracking inferiorly a few mm along the posterior C4 vertebral body margin and indenting the ventral aspect of the cecal sac and touching the ventral aspect of the spinal cord, but without any spinal cord displacement of compression and with a few mm of CSF posterior to the cord."[3] The remainder of the cervical spine was normal except for a mild disc osteophyte complex at C5-6. (Tr. at 298.)

\\\\\

---

[3] This description of C3-4 is part of what plaintiff claims the ALJ failed to discuss. See discussion *supra* n. 2.

        The ALJ relied in particular on two evaluations by consulting neurologist Dr. McIntire who had at his disposal several medical records. (Id. at 305, 178.) His first exam on March 27, 2004, found a pelvic deformity and diagnosed degenerative osteoarthritis of the cervical and lumbar spine and hips. (Id. at 181.) At this time, Dr. McIntire opined that although plaintiff described a history of cervical and lumbar pains, there were no findings suggesting cervical or lumbar *radiculopathy* or myelopathy. (emphasis added). Plaintiff did have loss of range of motion of the lumbar and cervical spine, however. Consequently, this neurologist limited plaintiff to lifting or carrying 15 pounds frequently and 30 pounds occasionally. There were no other limitations. (Id. at 181.) The ALJ fully discussed this report. (Id. at 27.)

On October 24, 2004, Dr. McIntire again examined plaintiff with the benefit of her lumbar CT scan[4] and a bone scan report. He found mild loss of range of motion of the lumbar spine, normal motor strength, normal sensory exam, and normal deep tendon reflexes. He questioned plaintiff's history of lumbar strain. He described her subjective lumbar pain as "nonradicular in character." He once again opined that objectively, there were no findings of lumbar *radiculopathy* or myelopathy. (emphasis added). Based on the mild loss of range of motion, however, he would restrict plaintiff to lifting and carrying only 25 pounds frequently and 50 pounds occasionally. There were no other functional limitations. (Id. at 307.)

It would seem that Dr. McIntire, a neurologist, would have understood the significance of a later report noting bilateral chronic radiculopathy, and it may have affected his opinion.

Exam by another neurologist, Dr. Engel, on March 4, 2003, revealed "no *radicular* symptoms either cervical or lumbar." (Tr. at 328.) (emphasis added). Therefore, based on all these prior records indicating no radiculopathy, this new evidence is material in that it may

[4] The lumbar CT scan, dated July 9, 2004, showed mild to moderate broad based disc bulge at L3-4 and L4-5. There was no disc bulge at L5-S1. There was no disc protrusion or canal stenosis. (Tr. at 292.)

affect the outcome of the case. The case will be remanded for consideration of these records by the ALJ.

Other records submitted to the Appeals Council also warrant remand for the ALJ's consideration as they indicate other changes in addition to radiculopathy. For example, on December 7, 2006, another CT scan of plaintiff's cervical spine was taken. The impression was "moderate neural foraminal compromise of uncinate spurring on the right at C5-6, unchanged. Interval new process or evidence of disc herniation is not proven." (Id. at 421.)

Plaintiff points to other records in support of her request for remand; however, not all of the records appear to be material. On December 11, 2006, an electrodiagnostic medicine consultation was performed. At this time, nerve conduction studies of the upper extremities were normal "with the exception of minimal prolongation of the distal sensory latencies on the right. Possibly this is an effect of temperature despite warming prior to testing." (Id. at 392-93.) There was no evidence of ongoing cervical radiculopathy, peripheral neuropathy, ulnar neuropathy or significant carpal tunnel syndrome. Dr. Filbrandt recommended correlating this study with other diagnostic test results, and suggested physical therapy. (Id. at 393.)

This study was repeated on October 26, 2007, and showed a normal EMG of the right upper extremity; however, the nerve conduction study showed a very mild median sensory conduction delay across the wrists. The conclusion was very mild bilateral carpal tunnel syndrome, which was marginally worse than the December 11, 2006 study. Nevertheless, there was no evidence of cervical radiculopathy, plexopathy, peripheral neuropathy or ulnar neuropathy. It was recommended that plaintiff undergo physical therapy and regular physical exercise. (Id. at 388-89.)

The aforementioned records are only a few of the approximately forty pages of records submitted to the Appeals Council. Of course, it is up to the ALJ to determine the significance of these records and whether further medical evaluation is necessary.

\\\\\

B. Whether the ALJ Erred in Determining That Plaintiff Was Not Fully Credible

Plaintiff contends that the ALJ's finding that plaintiff was not fully credible is not supported by substantial evidence.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Vasquez v. Astrue, 547 F.3d 1101 (9th Cir. 2008); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Bunnell at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[5] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be

---

[5] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Plaintiff is required to show only that her impairment "could reasonably have caused some degree of the symptom." Vasquez, 547 F.3d at 1104, *quoting* Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007, Smolen, 80 F.3d at 1282. Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing, and supported by reference to specific facts in the record. Vasquez, 547 F.3d at 1104-05.

Here, the ALJ analyzed plaintiff's credibility both in terms of her mental complaints and her pain testimony. His analysis of each area was quite developed, with a full page devoted to each of these areas. In regard to mental complaints, he found plaintiff to be not fully credible. The ALJ referred to Dr. Kalman's report which noted the lack of hospitalizations or outpatient treatment for depression. (Tr. at 29.) He also listed plaintiff's daily activities which were quite social in nature, and included visiting with family, having a few friends, and talking on the telephone daily. The mental status exam was normal, and plaintiff's GAF was 65.[6] Dr. Kalman's opinion was that plaintiff could deal with others, concentrate and withstand pressure and stress of daily work activities. (Id., 183-85.) The ALJ additionally noted that plaintiff had not been hospitalized for her mental problems, and records indicated that she was doing well without medications. She did not receive individual or group therapy and was not referred to mental health professionals. Her diagnosis of bipolar disorder was not made by a psychologist or

---

[6] Plaintiff's GAF was 63 at this time. GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV at 32.

psychiatrist. (Id. at 30.)

In regard to plaintiff's complaints of pain, the ALJ also fully analyzed her credibility on the record before him. With a full page of analysis, he first noted that the SA physicians found that plaintiff could do light work and Dr. McIntire thought she could do medium work, based on almost normal examination findings. (Id. at 30-31.) The ALJ also noted that the treating records from Oroville Hospital documented only mild conditions in objective testing. Further, the ALJ outlined the findings of Mr. Stack, PA, and Dr. Engel, explaining that they did not support the degree of pain alleged by plaintiff. Finally, the ALJ noted the lack of surgery, chiropractor treatment, pain clinic treatment, and steroid injections. (Id. at 31.)

Nevertheless, due to the new evidence submitted after the ALJ's decision, there is a real possibility that the findings of radiculopathy could change the ALJ's credibility analysis. On remand, the ALJ shall reconsider plaintiff's credibility in light of the newly submitted evidence.

C. Residual Functional Capacity

Plaintiff also claims that the ALJ erred in applying the grids where the state agency physician found that she was limited in reaching to one third of a work day. Plaintiff contends that when this limitation is combined with Dr. Kalman's finding that plaintiff was moderately limited in her ability to maintain concentration, persistence and pace, she can not do the full range of unskilled light work, and the ALJ erred in so finding.

The new evidence which the ALJ will be required to consider on remand may also affect this step of the sequential analysis. Therefore, the ALJ shall make a further determination of the type of work plaintiff can do after he has reconsidered plaintiff's limitations based on the new evidence.

CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment or remand is granted in part; defendant's motion for summary judgment is denied. This case is remanded to

the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of medical evidence presented to the Appeals Council, and its effect on plaintiff's residual functional capacity. The Clerk is directed to enter Judgment for plaintiff.

DATED: 07/30/09

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076/Siegel801.ss.wpd